### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| **MARIA GRISE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No.** |
| | ) |
| **EQUIFAX INFORMATION SERVICES, LLC,** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|             100 Shockoe Slip | ) |
|             2nd Floor | ) |
|             Richmond, VA  23219 | ) |
| | ) |
| | ) |
| **TRANS UNION, LLC,** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|             100 Shockoe Slip | ) |
|             2nd Floor | ) |
|             Richmond, VA 23219 | ) |
| | ) |
| **and** | ) |
| | ) |
| **WELLS FARGO BANK, N.A.** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|             100 Shockoe Slip | ) |
|             2nd Floor | ) |
|             Richmond, VA 23219 | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Maria Grise, by counsel, and for her Complaint against Defendants Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), and Wells Fargo Bank, N.A., ("Wells Fargo"), she states as follows:

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA"), and the Truth in Lending Act, 15 U.S.C. §§ 1601-1667f ("TILA").

2.      Equifax and Trans Union are two of the USA's major consumer reporting agencies (hereinafter, these two are collectively referred to as the "CRAs" or "CRA Defendants").

3.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Wells Fargo Bank, N.A., particularly when a consumer makes a dispute about information reported.

5.      Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is Wells Fargo (the "Furnisher"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against Equifax and Trans Union because each reported inaccurate account information about Plaintiff regarding a fraudulent balance on a Wells Fargo account. When Plaintiff disputed the inaccuracies, Equifax and Trans Union did not reasonably investigate, also violating Section 1681i.

7.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax and Trans Union have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8.      Likewise, Wells Fargo violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Wells Fargo did was consult its own credit reporting records about the account and confirm to the agencies the inaccurate information it was already reporting. Wells Fargo failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice from Plaintiff regarding the fraud and despite Wells Fargo even acknowledging the fraud in a letter to Plaintiff.

9.      Further, Wells Fargo violated 15 U.S.C. § 1643 of the Truth in Lending Act ("TILA") and 12 C.F.R. § 1026.12 of Regulation Z when it asserted liability against Plaintiff for unauthorized charges, in an amount in excess of $50, after Plaintiff notified Wells Fargo of the fraud.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 15 U.S.C. § 1640(e).

11.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). Plaintiff resides in this District and Division and all relevant facts regarding her injuries occurred here.

## PARTIES

12.     Plaintiff is a natural person residing in the State of Virginia, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.     Equifax is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

14.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

16.     Trans Union is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

17.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

19.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a foreign bank authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

20.     Wells Fargo is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

21.     At all times relevant to this Complaint, Wells Fargo, in the ordinary course of business, regularly extended open-end consumer credit, on which Wells Fargo assessed finance charges.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

22.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

24. Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

25. Section 1681e(b) sets forth the CRAs' overall du[t]y:

6

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

26.     Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

27.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

28.     It has long been the law that a CRA, such as Equifax or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir.

2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

29.    That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).   Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

30.    As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

31.    Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or

certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

32.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

### *Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty of Furnishers Such as Wells Fargo to Perform a Detailed and Systematic Investigation of Consumer Dispute*

33.    Today, furnishers such as Wells Fargo have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

34.    Furnishers' duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit– reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

incorrect information previously reported to the CRAs.

35.    "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

36.    Additionally, Wells Fargo has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting.   *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *Plaintiff Discovers Fraudulent, Unauthorized Transactions on her Wells Fargo Account and Disputes Those Transactions Directly with Wells Fargo*

37.    Plaintiff is the victim of identity theft.

38.    In or around August of 2011, Plaintiff established an open-end credit card account with Wells Fargo.

39.    In June or July of 2023, Plaintiff received a call from a person claiming to be a representative from Wells Fargo. The person asked Plaintiff to confirm that she is Maria Grise. Plaintiff did so. The person told Plaintiff that Wells Fargo had detected some fraudulent activity on her credit card, that the credit card had been cancelled, and that Wells Fargo had mailed a

replacement card. Plaintiff did not give out any personal information or account information during this phone call. Plaintiff only confirmed that her name is Maria Grise.

40.    In or around July of 2023, after Plaintiff received her monthly statement from Wells Fargo for 06/13/2023 – 07/13/2023, Plaintiff discovered that an unknown individual had stolen the credentials for Plaintiff's account with Wells Fargo and racked up $8,069.98 in fraudulent charges between July 11th -July 12th of this year.

41.    The unauthorized charges were as follows:

| 07/11 | 07/11 | 2439900608JTJZ1ST | BEST BUY MHT 00017673 CHARLOTTE NC | 2,465.68 |
| 07/11 | 07/11 | 2469216512YMNH7YA | APPLE STORE #R083 CHARLOTTE NC | 1,500.43 |
| 07/11 | 07/11 | 249416861RQEB5RNE | YSL #454 CHARLOTTE NC | 1,512.23 |
| 07/12 | 07/12 | 24137466201EMV9EY | SPEEDWAY 07933 3610 W NEW GREENSBORO NC | 43.16 |
| 07/12 | 07/12 | 2444500620 0VQTL7B | T-MOBILE STORE # 9406 GREENSBORO NC | 533.73 |
| 07/12 | 07/12 | 244921561LRJPQSM2 | LYFT  RIDE WED 2AM   855-865-9553 CA | 14.75 |
| 07/12 | 07/12 | 249416861LQ9N34GR | LOUIS VUITTON #104 CHARLOTTE NC | 2,000.00 |

42.    The only authorized charge on the Wells Fargo statement for 06/13/2023 – 07/13/2023 was a $12.50 charge for online training with the National Safety Council on 07/01/2023 for insurance purposes. Plaintiff paid Wells Fargo for this $12.50 in a timely manner, before interest began to accrue. The entire remaining balance on Plaintiff's Wells Fargo account is due to unauthorized, fraudulent charges. Plaintiff has not incurred any debt with Wells Fargo since the $12.50 charge on 07/01/2023.

43.    Upon receiving the statement for 06/13/2023 – 07/13/2023, Plaintiff immediately called Wells Fargo to report the fraud.

44.    Plaintiff learned that the person who had called her in June or July had not been calling in an official capacity from Wells Fargo. Instead, it was likely the fraudster who had already stolen Plaintiff's account credentials, calling in an attempt to make Plaintiff believe that Wells Fargo was already aware of the fraudulent activity (therefore buying the fraudster additional time to both rack up more charges and distance themself from their crimes).

45.     According to Wells Fargo employee Patrick C. Parker, an Escalation Manager in the Credit Card Fraud Department of Wells Fargo's "Executive Office", many of the unauthorized charges occurred in Charlotte, NC at SouthPark Mall—a place where Plaintiff has never been and has never spent any money.

46.     On or around July 28, 2023, Wells Fargo mailed a letter to Plaintiff stating that Wells Fargo had completed its research and "found that no fraud occurred, or that the transactions were authorized."

47.     On August 14, 2023, Plaintiff submitted a police report regarding the fraudulent transactions to Officer Daniel W. Lendemeyer of the City of Virginia Beach Police Department. The fraud case was assigned to Detective Caleb Davey.

48.     Plaintiff has provided a copy of the police report to Wells Fargo.

49.     Plaintiff has called Wells Fargo numerous times to dispute the unauthorized, fraudulent charges.

50.     On or around August 15, 2023, Wells Fargo mailed a letter to Plaintiff stating, "We have completed our research and found the disputed charges on your credit card account are valid and appear to be authorized by you. As a result, you are responsible for payment, and your claim has been closed."

51.     On or around August 30, 2023, Wells Fargo mailed two letters to Plaintiff, each stating, "We have completed our research and found the disputed charges on your credit card account are valid and appear to be authorized by you. As a result, you are responsible for payment, and your claim has been closed."

52.     On or around September 6, 2023, Wells Fargo mailed a letter to Plaintiff in which Wells Fargo suggested that Plaintiff verified a $2,000.000 purchase at Louis Vuitton via text

message on July 11, 2023. Wells Fargo's representation is entirely false. Plaintiff never received a fraud alert from Wells Fargo via text message and Plaintiff never verified any of the unauthorized, fraudulent charges.

53.     Also in the letter that Wells Fargo sent to Plaintiff on or around September 6, 2023, Wells Fargo stated that "Our records confirm on July 22, 2023, you contacted the Wells Fargo Credit Card Customer Service Department and reported unauthorized charges on your Visa account ending in 0285. You advised the Wells Fargo Customer Service Representative, you had received a telephone call on July 11, 2023, from a person claiming to be a Wells Fargo representative and you had provided them with all of your account information." This representation is also false. Although a person did call Plaintiff in June or July or 2023 and claim to be a Wells Fargo representative, Plaintiff did not give that person any account information or personal identifying information.

54.     On or around October 13, 2023, Wells Fargo mailed a letter to Plaintiff with the heading, "Immediate payment needed for your credit card account." The letter showed a current balance of $8,434.24, an amount due of $626.00, and an amount past due of $343.00.

55.     Upon information and belief, on or around October 24, 2023, Wells Fargo determined in an internal investigation that the charges were, in fact, the result of fraud.

56.     On or around October 31, 2023, Wells Fargo mailed a letter to Plaintiff saying that it was lowering Plaintiff's credit limit on her credit card due to "Recent delinquency on a Wells Fargo credit card", "Recent amounts owed on a wells fargo (sic) credit card are too high relative to the credit limit", and "Payments too low relative to balance on wells fargo (sic) credit card in last year (we look at amount of your debt)". The letter went on to say that "Our decision was based in whole or in part on information in a consumer report. . ."

57.     On or around November 14, 2023, Wells Fargo mailed a letter to Plaintiff in which Wells Fargo stated that it investigated Plaintiff's fraud claim and found in Plaintiff's favor on October 24, 2023. The letter further stated that Wells Fargo had asked the credit reporting agencies to report the account as "0 Balance; Current."

58.     Even after assuring Plaintiff in its November 14, 2023 letter that her account had been corrected, Wells Fargo continued (and continues still) to try to collect the fraudulent balance from Plaintiff.

59.     Despite Plaintiff providing ample notice of the unauthorized, fraudulent charges, Wells Fargo continues to harass Plaintiff and continues attempting to coerce Plaintiff into paying amounts to Wells Fargo that Plaintiff does not owe.

### Plaintiff Discovers the CRA Defendants were Reporting the Fraudulent Wells Fargo Balance Information and Disputes Those Inaccuracies

60.     In or around October 2023, Plaintiff discovered that Equifax, Experian, and Trans Union were reporting the fraudulent, unauthorized Wells Fargo account balance on Plaintiff's credit.

61.     On or around November 9, 2023, Plaintiff disputed the fraudulent, unauthorized Wells Fargo account balance with each of the CRA Defendants. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested.

62.     On or around November 14, 2023, Wells Fargo mailed the letter to Plaintiff discussed above, in which Wells Fargo acknowledged that it should not have been reporting any balance on Plaintiff's account.

63.     On or around November 24, 2023, Equifax mailed "dispute results" to Plaintiff. The "dispute results" revealed that Equifax was still reporting the fraudulent balance on Plaintiff's

credit. In the "results", Equifax stated, "THIS CREDITOR HAS VERIFIED TO OUR COMPANY THAT THE BALANCE IS BEING REPORTED CORRECTLY." The results showed the Wells Fargo account with a status of 60-80 days past due, a balance of $8,630, and an amount past due of $626.

64.     On or around November 25, 2023, Trans Union mailed "investigation results" to Plaintiff. Trans Union's "investigation results" show the account "VERIFIED AS ACCURATE", with a status of "Account 60 Days Past Due Date", a past due amount of $636, and a balance of $8,630.

65.     On or around November 30, 2023, Experian emailed Plaintiff and instructed her to access the results of her dispute through Experian's website. Experian induced Plaintiff to access her information via their website even though (1) Plaintiff sent her dispute to Experian via USPS, and (2) Plaintiff did not have an active account with Experian or Experian's affiliates. According to Experian's "dispute results", the Wells Fargo account was not reporting on Plaintiff's credit.

66.     Upon information and belief, the CRA Defendants are still reporting the fraudulent Wells Fargo account balance on Plaintiff's credit files.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

67.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax and Trans Union to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now known as Teleperformance.

68.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving

consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

69.      Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

70.      Teleperformance use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

71.      Teleperformance agents are not allowed to do any of the following things: contact the consumer, use the telephone or e-mail to investigate, research, contact the furnisher directly, or take longer than 5 minutes per dispute.

72.      The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

73.      In fact, both Equifax and Trans Union strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax or Trans Union.  The dispute gets sent to the Defendant CRAs' creditor customers (such as Wells Fargo) for their sole review and consideration.

74.      Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's

representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

75.    Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

76.    Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

77.    Equifax and Trans Union themselves did not conduct any reinvestigation of Plaintiff's disputes.  Instead, they merely caused the disputes to be removed from their control and to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Wells Fargo, Who Did Nothing

78.    In each instance in which Plaintiff disputed the Wells Fargo account with the CRAs, the CRAs forwarded Plaintiff's disputes to Wells Fargo using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are communicated back to CRAs.

79.    On information and belief, e-Oscar is also the system by which Wells Fargo has agreed it will accept consumer disputes from the CRAs.

80.     Each instance in which Wells Fargo received one of Plaintiff's disputes from a CRA, Wells Fargo became obligated under the FCRA to investigate that dispute.

81.     Plaintiff's disputes to Wells Fargo to attempt to have it reinvestigate her complaints went unanswered, as Wells Fargo continues to report the fraudulent account balance to the CRAs.

82.     Wells Fargo failed to reinvestigate Plaintiff's complaints.

83.     Despite Plaintiff filing a police report and providing that information with her disputes, Wells Fargo continued (and continues still) to report the fraudulent account information as accurate to the CRAs. Discovery will show that all Wells Fargo did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

84.     On dates better known to Equifax and Wells Fargo, Equifax furnished Plaintiff's dispute to Wells Fargo.

85.     On dates better known to Experian and Wells Fargo, Experian furnished Plaintiff's dispute to Wells Fargo.

86.     On dates better known to Trans Union and Wells Fargo, Trans Union furnished Plaintiff's dispute to Wells Fargo.

87.     In violation of § 1681s-2(b)(1)(A) of the FCRA, Wells Fargo failed to reasonably reinvestigate Plaintiff's disputes that it received from Equifax, Experian, and Trans Union.

88.     In violation of § 1681s-2(b)(1)(B) of the FCRA, Wells Fargo failed to review all relevant information provided by the CRAs regarding Plaintiff's disputes.

89.     Further, Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct, delete, or permanently block the account after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union.

90.     The Defendant CRAs responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to Wells Fargo.

91.     Upon information and belief, the Defendant CRAs (and Experian) timely notified Wells Fargo of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

92.     Upon information and belief, Wells Fargo received timely notice of Plaintiff's disputes from Equifax, Experian, and Trans Union, and the supporting documents submitted with Plaintiff's disputes.

93.     By its actions as described herein, Wells Fargo furnished and communicated false credit information regarding Plaintiff.

### *Plaintiff Suffered Actual Harm*

94.     Equifax and Trans Union continue to report the derogatory Wells Fargo account balance on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, Equifax and Trans Union are *still* reporting the fraudulent Wells Fargo account balance on Plaintiff's credit.

95.     Plaintiff attempted to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

96.     As a result of the inaccurate credit reporting and refusal to correct the account information, Plaintiff has suffered damages, including, but not limited to:

  a.   Loss of credit;

  b.   Stress from jeopardy to her security clearance and livelihood;

    c.   Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

    d.   Loss of time attempting to correct the inaccuracies;

    e.   Immense stress associated with attempting to resolve this matter;

    f.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration, humiliation and embarrassment, headaches, back pain, shortness of breath, chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy.

### *Defendants' Conduct was Willful*

97.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

98.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

99.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

100.    The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

101.    Just in federal court alone, during the past decade the creditor-furnisher disputed by Plaintiff has had to defend over 1,900 consumer credit lawsuits.

102.    In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

103.    The CRA Defendants knew or should have known of this litigation history.

104.    The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

105.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

106.    Each Defendant regularly receives unredacted consumer dispute details from this database.

107.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

108.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

109.    Further, over 190,000 of the CFPB complaints against Equifax and more than 160,000 complaints as to Trans Union were based largely on their failure to reasonably investigate consumer disputes.

110.    Just in the last 12 months alone, Equifax and Trans Union have each been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

111.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

112.    Equifax and Trans Union have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

113.    Equifax has even been warned by its home District Court, the Northern District of

Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D.

Ga. Aug. 29, 2005).

114.    Defendants have long had specific notice of these requirements. The seminal

Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

115.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

116.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[2]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

117.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

118.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

119.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of

---

[2] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

120.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

121.    Proportionately similar, Wells Fargo has also been sued in federal court over 2,500 times for consumer credit claims by consumers – most involving alleged violations of the FCRA.

122.    Further, Wells Fargo has received over 7,600 complaints from the CFPB regarding its credit reporting errors.

123.    Wells Fargo had notice of and its lawyers or other management employees

responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

124.    Wells Fargo had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

125.    Wells Fargo had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

126.    Wells Fargo had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

127.    Wells Fargo had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

128.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

129.    Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### Violation of 15 U.S.C. § 1681e(b) of the FCRA –*against Equifax and Trans Union*

130.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

131.    Equifax and Trans Union both violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Wells Fargo.

132.    As a result of Equifax's and Trans Union's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: time attempting to get the errors fixed, stress from threats to her security clearance, money spent on postage for dispute letters, anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration, humiliation and embarrassment, headaches, back pain, shortness of breath, chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy. Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax and Trans Union both ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

133.    Equifax and Trans Union both furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

134.    The violations by Equifax and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

135.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**Violation of 15 U.S.C. § 1681i(a) of the FCRA – *against Equifax and Trans Union***

136.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

137.    Equifax and Trans Union both violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff's credit files.

138.    Equifax and Trans Union both violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they received with Plaintiff's disputes.

139.    Equifax and Trans Union both violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Furnisher account.

140.    Equifax and Trans Union both violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

141.    As a result of Equifax's and Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: time attempting to get the errors fixed, stress from threats to her security clearance, money spent on postage for dispute letters, anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration,

humiliation and embarrassment, headaches, back pain, shortness of breath, chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy.

142.    The violations by Equifax and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

143.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III:**
**Violation of § 1681s-2(b)(1)(A) & (B) of the FCRA – *against Wells Fargo***

144.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

145.    Defendant Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished directly to it by Equifax, Experian, and Trans Union.

146.    Defendant Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to Wells Fargo.

147.    As a result of Wells Fargo's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: time attempting to get the errors fixed, stress from threats to her security clearance, money spent on postage for dispute letters, anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration,

humiliation and embarrassment, headaches, back pain, shortness of breath, chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy.

148.    The violations by Wells Fargo were willful, rendering Wells Fargo liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Wells Fargo was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

149.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Wells Fargo in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV:**
**Violation of § 1681s-2(b)(1)(E) of the FCRA – *against Wells Fargo***

150.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

151.    Defendant Wells Fargo violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Wells Fargo's failure to investigate as articulated herein, after Wells Fargo received notice of Plaintiff's disputes from Equifax, Experian, and Trans Union.

152.    As a result of Wells Fargo's violations of 15 U.S.C. § 1681s-2(b)(1)(E), Plaintiff suffered actual damages, as alleged above, including by example only and without limitation: time attempting to get the errors fixed, stress from threats to her security clearance, money spent on postage for dispute letters, anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration, humiliation and embarrassment, headaches, back pain, shortness of breath,

chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy. The violations by Wells Fargo were willful, rendering Wells Fargo liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Wells Fargo was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

153.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Wells Fargo in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V:**
**Violation of Truth in Lending Act and Regulation Z – *against Wells Fargo***

154.   Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

155.   All charges placed on the Wells Fargo account on July 11, 2023 and July 12, 2023 were unauthorized.

156.   Immediately upon receiving the first billing statement reflecting the unauthorized charges, Plaintiff took such steps as may be reasonably required in the ordinary course of business to provide the card issuer, Wells Fargo, with the pertinent information regarding the unauthorized charges on her Wells Fargo account.

157.   Under 15 U.S.C. § 1643 and 12 C.F.R. § 1026.12, Wells Fargo is prohibited from holding Plaintiff liable in any amount over $50 for unauthorized charges made before notification of the fraud to the card issuer.

158.   After receiving adequate notice from Plaintiff regarding the unauthorized transactions, Wells Fargo repeatedly asserted that Plaintiff was liable for an amount far above the statutory maximum of $50.

159.    Wells Fargo's attempts to illegally and wrongfully assert that Plaintiff was liable for the unauthorized charges caused Plaintiff extreme distress.

160.    As a result of Wells Fargo's violations of  15 U.S.C. § 1643 and 12 C.F.R. § 1026.12, Plaintiff suffered actual damages, as alleged above, including by example only and without limitation: time attempting to get the errors fixed, stress from threats to her security clearance, money spent on postage for dispute letters, anxiety, depression, loss of appetite, high blood pressure, irritability, feelings of frustration, humiliation and embarrassment, headaches, back pain, shortness of breath, chest tightness, dizziness, sleep loss, harm to reputation, harm to relationships, and loss of privacy.

161.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Wells Fargo in an amount to be determined by the Court pursuant to 15 U.S.C. § 1640.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Trans Union, and Wells Fargo;

(2)    Award Plaintiff attorney's fees and costs under the FCRA and TILA;

(3)    Award Plaintiff actual damages under TILA for violations by Wells Fargo;

(4)     Award Plaintiff statutory damages under TILA for violations by Wells Fargo in the amount of double the finance charge, pursuant to 15 U.S.C. § 1640(a)(2), with a minimum award of $500 and a maximum award of $5,000, or such higher amount as may be appropriate in light of the Defendant's pattern or practice of noncompliance;

(5)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(6)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**MARIA GRISE**

By:

/s/ Leonard A. Bennett
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

*Counsel for Plaintiff*